UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
UNITED STATES OF AMERICA,

                                    **MEMORANDUM AND ORDER**

    -against-                           18-CR-134 (KAM)


DONVILLE INNISS,

                        Defendant.
------------------------------------X

**MATSUMOTO, United States District Judge:**

        A three-count second superseding indictment, dated August 1, 2019, charges defendants Donville Inniss ("Mr. Inniss" or the "defendant"), and two others, Ingrid Innes ("Ms. Innes"), and Alex Tasker ("Mr. Tasker") (collectively, "defendants") with conspiracy to commit money laundering (Count I), in violation of 18 U.S.C. § 1956(h) and money laundering (Counts II and III), in violation of 18 U.S.C. § 1956(a)(2)(A). (ECF No. 50, Second Superseding Indictment (S-2) ("Indictment").)

        These charges are based on the following allegations: From in or about and between August 2015 and April 2016, Mr. Inniss, using his position as the Minister of Industry and as a member of the Parliament of Barbados, engaged in a scheme to accept approximately $36,000 in bribes from Ms. Innes, then-CEO of the Insurance Corporation of Barbados Ltd. ("ICBL"), and Mr. Tasker, then-Senior VP of ICBL, in violation of Barbadian law, and laundered the proceeds of the bribes to and through the

1

United States.  (*Id.* ¶ 10.)  Furthermore, the Indictment alleges
that Mr. Inniss, using his official position as Minister of
Industry, caused the Barbados Investment and Development
Corporation ("BIDC"), an agency of the government of Barbados
and over which Mr. Inniss exercised authority, to renew two
insurance contracts with ICBL.  (*Id.* ¶¶ 11 - 17.)

Specifically, the Indictment alleges that, in or about
July 2015, Mr. Inniss caused the BIDC to renew an insurance
contract with ICBL ("2015 Contract"), and that the 2015 Contract
required the BIDC to pay a premium of approximately 661,469.30
Barbadian Dollars, or roughly $330,734.65, to ICBL.  (*Id.* ¶ 12.)
In return, ICBL employees, including the other two defendants,
Ms. Innes and Mr. Tasker, allegedly agreed to pay a bribe of
approximately $16,536.73 ("Bribe One") to Mr. Inniss, in
consideration for his role in having caused the BIDC to renew
the 2015 Contract.  (*Id.* ¶ 13.)  Bribe One represented five
percent of the total premium that the BIDC owed to ICBL under
the 2015 Contract.  (*Id.*)  The Indictment charges that, in
concealment of the bribes, Mr. Inniss arranged to launder the
bribes through a bank account in the Eastern District of New
York in the name of the New York Dental Company ("New York
Dental Company Bank Account") (*Id.* ¶ 14.)  Payment was routed
through a bank branch located in Brooklyn, New York.  (*Id.*)

2

The Indictment also alleges that, in or about March 2016, Mr. Inniss caused the BIDC to renew another insurance contract with ICBL ("2016 Contract").  (*Id*. ¶ 16.)  In return, ICBL employees, including the other two defendants, allegedly agreed to pay an additional bribe of approximately $20,000 ("Bribe Two") to Mr. Inniss, in consideration for having caused the BIDC to renew the 2016 Contract.  (*Id*. ¶ 17.)

The Indictment further alleges the following transfers of funds:  On or about August 17, 2015, a majority shareholder of ICBL ("Bermuda Company") transferred approximately $16,536.73 to the New York Dental Company Bank Account based on a false invoice provided by Ms. Innes, Mr. Tasker, and "ICBL Executive 1" for purported consulting services.  (*Id*. ¶ 15.)  On or about August 19, 2015, the New York Dental Company transferred approximately $16,000 to a bank account in the United States in the name of Mr. Inniss via a check made payable to Mr. Inniss. (*Id*.)  Additionally, on or about April 18, 2016, the Bermuda Company transferred approximately $20,000 to the New York Dental Company Bank Account, based on a false invoice prepared by Ms. Innes, Mr. Tasker, and unnamed "ICBL Executive 1" for purported consulting services.  (*Id*. ¶ 18.)  On or about April 25, 2016, The New York Dental Company made transfers of approximately $9,000 and $8,000 to bank accounts in the United States, including at "Bank 1," in the name of Mr. Inniss, via checks

3

made payable to Mr. Inniss.  (*Id.*)  On or about April 27, 2016, the New York Dental Company transferred approximately $2,750 to a bank account in the United States in the name of Mr. Inniss, via a check made payable to Mr. Inniss.  (*Id.*)

## RELEVANT BACKGROUND

Pursuant to the April 3, 2019 Pretrial Scheduling Order ("Pretrial Scheduling Order"), the parties were required to file their pretrial motions by June 7, 2019, opposition papers by June 28, 2019, and reply papers by July 5, 2019.  (ECF No. 37, Pretrial Scheduling Order.)  Though the parties filed pretrial motions by June 7, 2019, they continued to submit filings, including additional motions, well outside of the court-ordered schedule.  On August 23, 2019, the government filed a supplemental motion *in limine* and a motion to produce and find a document not protected by the attorney-client privilege.  (ECF No. 53, Supplemental Motion in Limine; ECF No. 54, First Motion to Produce and find document not protected by a-c privilege.)  On September 3, 2019, the government filed a supplement to its first motion *in limine*.  (ECF No. 56, Letter re September 6, 2019 conference and supplemental motion in limine as to Donville Inniss.)  On September 4, 2019, the government filed a motion to take a Rule 15 deposition, which the court granted on September 12, 2019.  (ECF No. 62, Motion to Take Deposition; ECF No. 70, Memorandum and Order granting

4

Motion to Take Deposition.)  Over two months after submitting
his initial pretrial motions on June 7, 2019, Mr. Inniss filed a
motion to strike a section of foreign law and to object to that
portion of the proposed testimony of the government's expert
witness, Thomas Durbin LLM ("Mr. Durbin").  (ECF No. 74, Letter
Motion to Strike Section of Foreign Law and Objection to
Proposed Expert Testimony ("Def. Mot. to Strike"), dated
9/16/2019.)  The parties mutually agreed, with permission from
the court, to adjourn the trial date from October 28, 2019 to
January 13, 2020, in part to permit the court to consider the
later-filed motions.  (Dkt. Entry dated 10/14/2019.)

        This Memorandum and Order addresses the government's
eight motions *in limine* before the court ("Gov. Motions").
Pursuant to the Pretrial Scheduling Order, on June 5, 2019, the
government timely submitted its initial five motions *in limine*,
requesting that the court: (1) admit evidence concerning
defendant's request to ICBL for a purported donation to the
Corporation; (2) preclude defendant from introducing evidence or
argument concerning Barbadian criminal law enforcement,
including that Barbadian law enforcement has not, to date,
charged defendant with any crimes; (3) preclude defendant from
introducing evidence or argument that bribes are a custom or
practice in Barbados; (4) preclude evidence or argument
concerning defendant's prior commission of "good acts" or non-

commission of other bad acts; and (5) <u>preclude</u> evidence or argument concerning defendant's family background, health condition, age, conditions of pretrial release, or any other personal factor unconnected to guilt.  (ECF No. 39, First Motion in Limine by USA as to Donville Inniss.)  On July 1, 2019, three days after the court-ordered deadline set forth in the Pretrial Scheduling Order, and without seeking an extension, defense counsel filed defendant's response to the government's initial motions *in limine*.  (ECF No. 43, Response to Motion re First Motion in Limine.)  On July 3, 2019, the government timely submitted its reply to defendant's response.  (ECF No. 44, Notice Reply as to Donville Inniss re Response to Motion.)

On August 23, 2019, nearly two months after the deadline to file pretrial motions according to the Pretrial Scheduling Order, the government filed two pretrial motions, in addition to its first five motions: (6) a supplemental motion *in limine*, requesting that the court <u>admit</u> evidence of defendant's "financial motive to commit the charged offenses," either as direct evidence or pursuant to Rule 404(b) of the Federal Rules of Evidence ("Rule 404(b)") (ECF No. 53, Supplemental Motion in Limine by USA as to Donville Inniss); and (7) a motion requesting that the court <u>find</u> that a document is not protected by the attorney-client privilege, permit the government to use the document in its prosecution of the case, and <u>produce</u> the

6

document to Mr. Inniss in discovery.  (ECF No. 54, First Motion
to Produce and find document not protected by a-c privilege
("Privilege Motion").)

On September 5, 2019, Mr. Inniss filed his opposition
to the government's supplemental motion *in limine*.  (ECF No. 63,
Response in Opposition re Supplemental Motion in Limine.)  On
September 3, 2019, counsel for Ms. Innes, Mr. John Joseph
Rolecki, Esq., filed a notice of appearance, and Ronald DeWaard,
Esq. and Gary Mouw, Esq. filed motions to appear *pro hac vice* on
behalf of Ms. Innes (collectively, "Ms. Innes's counsel").  (ECF
No. 57, Notice of Attorney Appearance: John Joseph Rolecki; ECF
No. 58, Motion to Appear Pro Hac Vice for Gary Mouw; ECF No. 59,
Motion to Appear Pro Hac Vice for Ronald DeWaard.)  On September
3, 2019, Ms. Innes's counsel filed a letter requesting 10
additional days to respond to the government's Privilege Motion,
which extension the court granted on September 5, 2019.  (ECF
No. 60, Motion for Extension of Time to File Response/Reply as
to First Motion to Produce and find document not protected by a-
c privilege; Dkt. Order dated 9/5/2019.)  On September 13, 2019,
Ms. Innes's counsel filed its response in opposition to the
government's Privilege Motion, including three exhibits that it
provided to the court for *in camera* review.  (ECF No. 73,
Response to Motion re First Motion to Produce and find document
not protected by a-c privilege ("Privilege Opp.").)  On

September 18, 2019, the government filed its reply brief in further support of its Privilege Motion.[1]  (ECF No. 75, Reply to Response to Motion re First Motion to Produce and find document not protected by a-c privilege (response to Doc #73) ("Privilege Reply").)

On September 3, 2019, the government filed its eighth pretrial motion *in limine*, requesting that the court <u>admit</u> evidence concerning two additional 7,000 Barbadian dollar "donations" that ICBL made to defendant as direct evidence of the crimes charged or admissible evidence under Rule 404(b). (ECF No. 56, Supplement to Government's First Motion in Limine.) On September 6, 2019, defense counsel filed its opposition to the motion.  (ECF No. 64, Response in Opposition re First Motion in Limine (Supplemental Letter Dated September 3, 2019).)  On September 12, 2019, the government filed its reply.  (ECF No. 71, Letter Reply in Support of Supplemental Motion in Limine.)

---

[1] Ms. Innes had submitted her declaration, in support of her opposition to the government's Privilege Motion, to the court for *in camera* review, "to preserve her attorney-client privilege," but articulated no reason why the declaration was privileged.  (ECF No. 73, Privilege Opp. 1-2 n.1.)  The government has requested that the court order Ms. Innes to "unseal all portions of her declaration that are not protected by the attorney-client privilege."  (ECF No. 75, Privilege Reply 3.)  Ms. Innes did not object to the government's specific request that she unseal all portions of her declaration that are not protected by the attorney-client privilege.

The court finds that Ms. Innes's declaration is not protected by the attorney-client privilege because it does not contain any substantive discussion of her counsel's legal advice or other confidential communication between Ms. Innes and her counsel.  The court hereby **grants** the government's request and directs Ms. Innes's counsel to file Ms. Innes's unredacted declaration on ECF **by 5:00 p.m. on December 23, 2019.**

For the reasons set forth below, the court grants in part and denies in part the government's motions *in limine*.

<u>**LEGAL STANDARDS**</u>

**A. Motions *in Limine***

The government's pretrial motions all seek preliminary rulings on the admissibility of certain evidence. "A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Capital Mgmt., LP v. Schneider*, 551 F. Supp. 2d 173, 176-77. The purpose of a motion *in limine* is to "aid the trial process by enabling the court to rule in advance of trial on the relevance of certain forecasted evidence." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). Thus, the trial court should only exclude evidence when it is "clearly inadmissible on all potential grounds." *United States v. Paredes*, 176 F. Supp. 2d 192, 193 (S.D.N.Y. 2001); *see also, e.g.*, *United States v. Ceballo*, No. 13-CR-308 (KAM), 2014 WL 4980554, at *1 (E.D.N.Y. Oct. 6, 2014); *Barret*, 2011 WL 6704862, at *4.

In reviewing motions *in limine*, the court bears in mind that the Federal Rules of Evidence establish a general rule of admissibility. Fed. R. Evid. 401. If evidence is "relevant," it is admissible "unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme

9

Court." Fed. R. Evid. 402. Evidence is relevant where "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Irrelevant evidence, on the other hand, is not admissible. Fed. R. Evid. 402. "Evidence need not be conclusive in order to be relevant." *United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) (internal quotation marks and citation omitted). "Nonconclusive evidence should still be admitted if it makes a proposition more probable than not; factors which make evidence less than conclusive affect only weight, not admissibility." *Id*. (internal quotation marks and citation omitted).

### B. Uncharged Criminal Conduct or Bad Acts

The threshold question in deciding a motion *in limine* to admit evidence of a criminal defendant's prior criminal conduct or bad acts is determining whether such evidence constitutes *direct* evidence of the crime charged or *other acts* evidence subject to Rule 404(b). *See United States v. Ivanova*, 19 F. Supp. 3d 511, 514 (S.D.N.Y. 2014). In either case, the court must determine whether the evidence is relevant and, if so, consider whether to exclude the evidence pursuant to Rule 403 because its probative value is substantially outweighed by a danger of unfair prejudice. *United States v. Nektalov*, 325 F.

Supp. 2d 367, 372 (S.D.N.Y. 2004) (citing *United States v. Bowie*, 232 F.3d 923, 927 (D.C. Cir. 2000).

Although evidence may be relevant as probative of defendant's charged conduct, this evidence may nevertheless be inadmissible under Federal Rule of Evidence 403 ("Rule 403") if "its probative value is **substantially outweighed** by a danger of . . . unfair prejudice." Fed. R. Evid. 403 (emphasis added); *United States v. Bourne*, No. 08-CR-888, 2011 WL 4458846, at *12 (E.D.N.Y. Sept. 23, 2011) ("Evidence of uncharged acts may be admissible, subject to limitations imposed by Rule []403[.]"). "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). In determining whether evidence is unfairly prejudicial, the court considers it in the context of the crime charged, excluding evidence that is "more inflammatory than the charged crime." *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (upholding district court's admission of evidence of "similar act" because it was relevant to defendant's assertion of mistake); *cf. United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (finding no unfair prejudice where "evidence of prior narcotics transactions 'did not involve conduct any more sensational or disturbing than the crimes with

11

which [the appellants were] charged.'") (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)).

### 1. Admissibility as Direct Evidence

Evidence of uncharged criminal conduct or other bad acts is relevant and properly admissible as direct evidence, as opposed to other acts evidence under Rule 404(b), if such conduct "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted) (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)).  A "trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the Indictment."  *Gonzalez*, 110 F.3d at 941. Background evidence may be admitted in order to show, for example, the "circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."  *Id*.

"[W]here . . . a conspiracy is charged, uncharged acts may be admissible as direct evidence of the conspiracy itself." *United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003) (internal quotation marks omitted) (upholding district court's admission

of 16 uncharged robberies). "An act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *United States v. Rivera*, No. 13-CR-149 (KAM), 2015 WL 1875658, at *3 (E.D.N.Y. Apr. 22, 2015) (quoting *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (internal quotation marks omitted); *United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (in conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself").

All evidence of "intrinsic act[s] offered as direct proof of the crime charged will, by definition, satisfy Rule 404(b)." *Id.* The only practical difference in admitting other acts as direct evidence is that "the Government escapes 404(b)'s notice requirement and the Court need not give a limiting instruction cautioning the jury against making an improper inference of criminal propensity." *Id.*

2. Admissibility under Rule 404(b)

Rule 404(b) provides that:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as proving **motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.**

Fed. R. Evid. 404(b) (emphasis added).

13

The Second Circuit has adopted an inclusionary approach to Rule 404(b), admitting other acts evidence unless it is "introduced for the sole purpose of showing the defendant's bad character, . . . [is] overly prejudicial under Fed. R. Evid. 403[,] or not relevant under Fed. R. Evid. 402." *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996). "The district court has broad discretion to admit evidence pursuant to Rule 404(b), and its ruling will not be overturned on appeal absent [an] abuse of discretion." *United States v. Midyett*, 603 F. Supp. 2d 450, 454 (E.D.N.Y. 2009) (citing *Carboni*, 204 F.3d at 44).

In ruling on the admissibility of evidence under Rule 404(b), the court must consider whether: "(1) it was offered for a proper purpose; (2) it was relevant to a disputed trial issue; (3) its probative value is substantially outweighed by its possible prejudice; and (4) the trial court administered an appropriate limiting instruction." *United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003) (citing *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992). The government must show that it seeks to offer the other acts evidence for a proper purpose, not as improper propensity evidence.

## DISCUSSION

**A. Motion to Admit Evidence of Mr. Inniss's Request to ICBL for a Purported Donation to the Corporation**

14

The government's first motion *in limine* seeks to admit evidence concerning defendant's request to ICBL for a purported "donation" to the Corporation in December 2015, as direct evidence of the charged crimes in the Superseding Indictment or, in the alternative, as admissible evidence pursuant to Rule 404(b).[2] (ECF No. 39 at 3-7.) Mr. Inniss's counsel conceded the government's motion, noting that the government's request seems "well within reason," but noted that defense counsel "may renew its opposition . . . and seek preclusion" pursuant to Federal Rule of Evidence 403, once the defense has had an opportunity to review the 3500 materials (ECF No. 43, p. 3, fn. 3.) As of the date of this decision, Mr. Inniss's counsel does not dispute that evidence "that Donville Inniss requested a bribe . . . during the time period set forth in the indictment would be probative of the existence of the conduct alleged in the indictment, and therefore constitute[s] direct evidence." (ECF No. 43, p. 3.) The court agrees. For the reasons set forth below, the court **grants** the government's motion *in limine* to admit direct evidence regarding Mr. Inniss's solicitation of an alleged bribe in December 2015, ICBL's payment of the alleged bribe, and the subsequent transfer of $6,500 from an account at

---

[2] For the purpose of ruling on the admissibility of evidence, the court accepts as true the government's factual characterizations regarding the evidence it seeks to admit, as contained in the government's motions *in limine*. (*See, e.g.,* ECF Nos. 39, 53, and 56.)

First Caribbean International Bank (Barbados) Limited to Mr.
Inniss's personal bank account in Florida.

According to the government, while defendant was the
Minister of Industry in Barbados, he controlled the Corporation.
In 2014 and 2015, defendant sought purported "donations" from
ICBL and directed payment of those "donations" to the
Corporation.  (ECF No. 39, p. 3.)  The government asserts that
evidence reflects that at least one of these purported
"donations" was a bribe.  (*Id.*)  The government seeks to
introduce "evidence that Inniss sought another bribe payment
from ICBL," on or about December 12, 2015, when Mr. Inniss sent
an email to Mr. Tasker with an attached "invoice" dated December
10, 2015, requesting $4,000.00 as a "fee for professional
services rendered in respect of corporate growth strategies."
(*Id.*)  The invoice was from the Corporation and addressed to
ICBL, to Mr. Tasker's attention.  (*Id.*)  The December 10, 2015
invoice was allegedly "replaced" by a second invoice, also dated
December 10, 2015, which requested $4,000.00 as a "donation" to
a "community event," and omitted any reference to a "fee for
professional services."  (*Id.* at 3-4.)  On or about December 17,
2015, ICBL made out a check to the Corporation for 4,000
Barbadian dollars (approximately $2,000).  (*Id.* at 4.)  A
document produced by ICBL described the payment as a "donation –
community event."  (*Id.*)  Mr. Inniss deposited this check into

16

an account in the name of the Corporation, at First Caribbean
International Bank (Barbados) Limited.  (*Id.*)  On or about
December 22, 2015, approximately $6,500 was transferred from an
account at First Caribbean International Bank (Barbados) Limited
to Mr. Inniss's personal bank account in Florida.  (*Id.*)

The court finds that evidence of Mr. Inniss's December
2015 request to ICBL to pay the foregoing amounts to the
Corporation is admissible as direct evidence of the money
laundering conspiracy charged in Count One of the Indictment.
(*Id.* at 5.)  ICBL paid the purported bribes that are alleged in
the Indictment on or about August 17, 2015 and April 18, 2016,
respectively.  (*Id.*)  The government asserts that "[e]vidence
showing that Inniss requested an additional bribe from Tasker in
the middle of that time period – in or about December 2015 – and
that, at around the same time, funds were transferred from an
account at the bank where Inniss received the bribe (First
Caribbean International Bank (Barbados) Limited) to Inniss'
personal bank account in the United States, is **'inextricably
intertwined** with the evidence regarding' Count One and 'is
necessary to complete the story of the crime[] on trial."  (*Id.*
at 5-6 (emphasis added) (citing *Carboni*, 204 F.3d at 44).)

Evidence that Mr. Inniss solicited, received, and
transferred to his personal bank account another bribe from Mr.
Tasker, a co-defendant who is also charged in the Indictment

17

with conspiracy to launder money and money laundering offenses,
during the time period alleged in the Indictment, is plainly
admissible.  Such evidence reflects conduct that "arose out of
the same transaction or series of transactions as the charged
offense," is "inextricably intertwined" with the evidence
regarding the charged offenses and is "necessary to complete the
story of the crime on trial."  *United States v. Carboni*, 204
F.3d at 44 (2d Cir. 2000) (internal quotation marks omitted)
(quoting *United States v. Gonzalez*, 110 F.3d at 942 (2d Cir.
1997)).  Thus, the court finds that this uncharged conduct is
not "other crimes" evidence and is therefore not subject to the
restrictions of Rule 404(b).

As previously noted, it is well-settled that
"uncharged acts may be admissible as direct evidence of the
conspiracy itself." *See Baez*, 349 F.3d at 93 (2d Cir. 2003)
(internal quotation marks omitted); *cf. United States v. Rivera*,
No. 13-CR-149 (KAM), 2015 WL 1875658, at *3 (E.D.N.Y. Apr. 22,
2015) ("An act that is alleged to have been done in furtherance
of the alleged conspiracy" is considered "part of the very act
charged.") (quoting *United States v. Diaz*, 176 F.3d 52, 79 (2d
Cir. 1999) (internal quotation marks omitted); *United States v.
Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (in conspiracy cases,
"uncharged acts may be admissible as direct evidence of the
conspiracy itself").  Accordingly, the court grants the

18

government's motion *in limine* to admit evidence regarding Mr. Inniss's solicitation of one or more purported bribes and the subsequent transfer of $6,500 from an account at First Caribbean International Bank (Barbados) Limited to Mr. Inniss's personal bank account in Florida. Because the court finds that such evidence is admissible as direct evidence, it need not decide whether this evidence is also admissible under Rule 404(b).

**B. Motion to Preclude Evidence of Barbadian Criminal Law Enforcement**

The government's second motion *in limine* requests that the court preclude the defendant from introducing evidence or argument concerning Barbadian criminal law enforcement, including that Barbadian law enforcement has not, to date, charged defendant with any crime, on the ground that such information is irrelevant to the case. (ECF No. 39, pp. 7-10.) Additionally, the government asserts that if the court found such evidence to be relevant, the court should preclude the admission of this evidence under Rule 403 because it would risk jury confusion and invite the jury to draw improper inferences regarding Mr. Inniss's guilt or innocence. (*Id.*)

Defense counsel has acknowledged the merits of the government's motion *in limine*: "[T]he decisions of local law enforcement are plainly irrelevant to the charges of a conspiracy to commit money laundering and substantive money

laundering in this case.  Donville Inniss does not have any intention to raise such issues, and therefore takes no position on the government's application."  (ECF No. 43, p. 3.)

For the reasons set forth below, the court **grants** the government's motion *in limine* to preclude defendant from introducing evidence concerning either the activities, or inaction, of Barbadian law enforcement against Mr. Inniss.

Federal Rule of Evidence 401 ("Rule 401") classifies evidence as relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Under Federal Rule of Evidence 402 ("Rule 402"), relevant evidence is generally admissible, whereas irrelevant evidence is "not admissible."  Fed. R. Evid. 402.

Whether the Barbadian law enforcement authorities have charged Mr. Inniss with a crime or whether they are investigating Mr. Inniss is irrelevant to the jury's determination at trial of whether Mr. Inniss solicited or accepted bribes, in violation of the Barbados Prevention of Corruption Act.  Information regarding the Barbadian law enforcement authorities' actions – or lack thereof – would be probative of entirely irrelevant issues for purposes of the present trial, including potentially "timing issues, the availability and allocation of law enforcement resources and

20

prosecutorial priorities." (ECF No. 39, p. 8.) The government
cited *United States v. Heon-Cheol Chi*, in which the court
granted the government's motion *in limine* seeking to preclude
the defendant from offering evidence of whether he had been
prosecuted in Korea for the specified unlawful activity of
bribery. (*Id.*) In that case, the Central District of
California court ruled that "whether defendant has been
arrested, charged with, or convicted of a crime in Korea is not
relevant to the defendant's state of mind." *United States v.
Heon-Cheol Chi*, No. 16-824 (JFW), Tr. at 56:22-24 (C.D. Cal.
July 7, 2017). As noted above, defense counsel did not object
to the government's motion and expressly concedes that evidence
concerning the Barbadian government's actions is "plainly
irrelevant" here. (ECF No. 43 at 3.) Therefore, the court
**grants** the government's motion *in limine* to preclude irrelevant
evidence concerning Barbadian criminal law enforcement,
including whether such law enforcement has charged defendant
with any crimes.

**C. Motion to Preclude Evidence That Bribes Are a Custom or
Practice in Barbados**

        The government's third motion *in limine* seeks to
preclude Mr. Inniss from introducing evidence or argument that
bribes are a custom or practice in Barbados. (ECF No. 39 at 10-
12.) The government indicates that it has "disclosed evidence

to the defendant that ICBL made payments to other government
officials in Barbados" and that the "charges against [Mr.
Inniss] are entirely unrelated to these other payments that ICBL
made to other government officials. (*Id*. at 10-11.)
Furthermore, the government represents that it "does not intend
to introduce any evidence of these unrelated payments" and "is
not aware that [Mr. Inniss] knew of these payments." (*Id*.)
Accordingly, the government asserts that the existence of such
payments is irrelevant to the charges against Mr. Inniss. (*Id*.)
Defense counsel apparently concedes the government's motion *in
limine* concerning this issue: "Inniss is unaware of any lawful
'custom or common practice' defense to a violation of charges of
a conspiracy to commit money laundering and/or money
laundering"; defendant is "unaware that bribery is a 'custom or
common practice' in Barbados"; and defendant "does not have any
intention to raise such an issue." (ECF No. 43 at 3-4.)

        The court agrees that evidence of unrelated bribes
paid by ICBL, of which Mr. Inniss was not aware, is not relevant
to the charges against Mr. Inniss. Fed. R. Evid. 401; Fed. R.
Evid. 402. Indeed, whether or not bribery is an industry
practice in Barbados would not shed any light on Mr. Inniss's
state of mind. *United States v. Oldbear*, 568 F.3d 814, 821
(10th Cir. 2009) (holding that the district court properly
excluded testimony that attempted to establish an "everybody-is-

22

doing-it" defense).  Finally, as noted above, defense counsel
has represented that it is not aware that bribery is, in fact, a
common practice or custom in Barbados and that defendant does
not intend to make such an argument.  (ECF No. 43 at 3-4.)
Accordingly, the court finds the unrelated bribes irrelevant and
**grants** the government's motion *in limine* to preclude any
evidence that ICBL has paid bribes to other individuals, or
argument that bribery may have been commonplace or part of
industry practice in Barbados.

### D. Motion to Preclude Evidence Concerning Defendant's Prior Commission of Good Acts or Non-Commission of Bad Acts

The government's fourth motion *in limine* requests that
the court preclude evidence or argument concerning Mr. Inniss's
prior commission of "good acts" or non-commission of other bad
acts.  For the reasons set forth below, the court **grants** the
government's motion.

"While non-criminal activities may be relevant where
the defendant is alleged to have engaged in 'ceaseless' criminal
conduct, '[a] defendant may not seek to establish his innocence
. . . through proof of the absence of criminal acts on [other]
specific occasions." *See United States v. Nekritin*, No. 10-CR-
491 (KAM), 2011 WL 2462744, at *5 (E.D.N.Y. June 17, 2011)
(quoting *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir.
1990)); *see also United States v. Benedetto*, 571 F.2d 1246,

1249-50 (2d Cir. 1978) (testimony that "defendant had not taken bribes" on prior occasions was improperly admitted). "[C]haracter evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts." *Benedetto*, 571 F.2d at 1249-50. (citing *Michelson v. United States*, 335 U.S. 469, 477 (1948)).  In *Benedetto*, the Second Circuit found that the district court had improperly admitted "evidence of **specific acts** . . . ostensibly designed to prove that [defendant] was a person of good character, unlikely to have taken the alleged bribes."  *Id.* (emphasis added). Similarly, in *O'Connor*, the Second Circuit noted that proposed testimony about defendant's "specific good acts, as reflected in FBI reports of interviews with [others] who stated that they had not paid appellant any bribes" should be excluded.  *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978) (citing *Benedetto*, 571 F.2d at 1249-50).

Although a character witness may give general testimony concerning the defendant's reputation for a "pertinent trait of character" or the witness's opinion of the defendant with regard to that trait, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."  Fed. R. Evid. 404(a); Fed. R. Evid. 405(a).  A defendant may not testify or offer other proof to

24

establish specific acts in conformity with a trait, unless that trait is an "**essential element** of the charge, claim, or defense." Fed. R. Evid. 405(b) (emphasis added). For instance, in *Rivera*, the court precluded "evidence of unrelated prior good conduct, i.e., charitable giving or cooperation with law enforcement" on the basis that it was not relevant to the charged conduct, and any minimal probative value of such evidence was outweighed by the likelihood of jury confusion and the risk of jury nullification. *United States v. Rivera*, No. 13-CR-149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015).

Defense counsel opposes the government's motion *in limine* by arguing that the Second Circuit has allowed criminal defendants to "introduce evidence of . . . good character." (ECF No. 43 at 5.) Defendant's argument, however, misses the mark. It is undisputed that Mr. Inniss may offer evidence of a pertinent character trait under Rule 404(a)(2)(A), so long as it does not take the form of specific prior act evidence, or evidence that Mr. Inniss did not commit bad acts on prior occasions. Fed. R. Evid. 404(a)(2)(A).

Moreover, as the government noted, none of the cases cited by defense counsel supports the proposition that a defendant may introduce evidence of specific prior good acts or non-commission of other bad acts. (ECF No. 44 at 2.) In

*Pujana-Mena*, the defense had presented "three character witnesses . . . who testified as to [defendant's] reputation in his community as an honest and law-abiding person," as opposed to specific prior good acts. *United States v. Pujana-Mena*, 949 F.2d 24, 26 (2d Cir. 1991). In *Han*, the Second Circuit found that the district court had erred in excluding defendant's proffered testimony of "his reputation for uprightness and an unwillingness to exploit others," but that this error was harmless in light of the substantial evidence presented at trial that tended to prove defendant's criminal intent. *United States v. Han*, 230 F.3d, 560, 563-64 (2d Cir. 2000). Evidence of a defendant's lack of criminal record is, however, typically admitted as "background" evidence even though it may be of "relatively low probative value." *United States v. Blackwell*, 853 F.2d 86, 88 (2d Cir. 1988) (finding that testimony concerning defendant's military service, college education, and lack of criminal history was admissible as "background" evidence). Therefore, the court **grants** the government's fourth motion *in limine* requesting preclusion of evidence or argument concerning Mr. Inniss's prior commission of "good acts" or non-commission of other bad acts. Pursuant to Federal Rule of Evidence 405 ("Rule 405"), Mr. Inniss may, however, proffer evidence of good character in the form of testimony regarding

his reputation, without reciting good acts or the lack of bad
acts.

### E. Motion to Preclude Evidence Concerning Defendant's Family Background, Health, Age, and Other Personal Factors

The government's fifth motion *in limine* requests that
the court preclude evidence or argument concerning Mr. Inniss's
family background, health condition, age, conditions of pretrial
release, or "any other personal factor unconnected to guilt."
(ECF No. 39 at 13.)  The government also requests that the court
preclude evidence or argument "concerning the punishment or
consequences [defendant] faces if convicted," on the basis that
such evidence or argument would create a risk of jury confusion.
(*Id.* at 14.)  Defense counsel did not confirm whether Mr. Inniss
intends to offer the above categories of evidence at trial;
nevertheless, defense counsel opposes the government's motion on
the ground that "[s]hould Donville Inniss decide to exercise his
Sixth Amendment right to testify at his upcoming trial, the
jurors will have the opportunity [to] hear his individual
history, which includes both his triumphs and failures."  (ECF
No. 43 at 6.)  Further, defense counsel asserts that
"[t]estimony about a witness' individual history and present
circumstances is customary" and would not "cause jurors to lose
sight of their function."  (*Id.* at 6-7.)  However, defense

27

counsel acknowledges that the court should "instruct the jury
that its verdict is not to be based upon sympathy."  (*Id.* at 7.)

The district court has "wide discretion concerning the
admissibility of background evidence," such as information about
a defendant's career or education.  *Blackwell*, 853 F.2d at 88
(2d Cir. 1988); *United States v. Kosinski*, 2017 WL 4953902, at
*5 (D. Conn. Oct. 31, 2017).  Consistent with that discretion, a
court may limit the introduction of background evidence that is
not relevant under Rule 401 or that risks unfair prejudice,
confusing the issues, misleading the jury, or wasting time under
Rule 403.  Fed. R. Evid. 401; Fed. R. Evid. 403; *Kosinski*, 2017
WL 4953902, at *5-6 (D. Conn. Oct. 31, 2017); *United States v.
Lopez*, 2017 WL 6554955, at *6 (W.D.N.Y. Dec. 22, 2017)
(documents concerning a defendant's employment history and
educational record, which were offered to prove defendant's law-
abiding nature, were properly excluded as evidence of specific
acts).

As previously noted, pursuant to Rule 405, defendant
is permitted to elicit witness testimony concerning defendant's
reputation for a pertinent character trait or a witness's
opinion regarding that trait.  Fed. R. Evid. 405; *United States
v. Lopez*, 2017 WL 6554955, at *6.  Consistent with the bounds
and guidelines of Rules 401, 403, 405, and any other relevant
rule of evidence asserted by the parties, the court shall

28

evaluate the relevance, probative value, and potential prejudicial effect of any proffered evidence, and shall exclude evidence that is not relevant, lacking in probative value, or substantially more prejudicial than probative.  At this juncture, the court respectfully **denies**, in part, the government's fifth motion *in limine*, with respect to the government's request that the court preclude evidence of any personal or background information concerning Mr. Inniss.

The court next considers the government's request that the jury be instructed not to reach a verdict motivated by sympathy for defendant.  It is well-established law that the jury has a limited function – to determine guilt or the lack thereof; consequently, the jury has no role in sentencing with the exception of certain circumstances, such as capital cases, or where a witness or prosecutor misleads the jury, which are not relevant here.  In *Shannon v. United States*, the United States Supreme Court stated the following about the jury's role at trial:

> It is well established that when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed.  The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury.  The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged.  The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a

> guilty verdict. *Information regarding the consequences of a verdict is therefore irrelevant to the jury's task.* Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.

*Shannon v. United States*, 512 U.S. 573, 579 (1994) (emphasis added) (internal citations and quotation marks omitted).

Applying *Shannon*, courts within the Second Circuit have ruled that a defendant is generally not entitled to a jury instruction on the sentence he could receive. *United States v. Pabon-Cruz*, 391 F.3d 86, 94-95 (2d Cir. 2004) (holding it was not error for district court not to inform the jury of the mandatory minimum sentence defendant would receive if convicted); *United States v. Polouizzi*, 564 F.3d 142, 160-61 (2d Cir. 2009) (same); *United States v. Blume*, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences.") (citation omitted); *United States v. Dupree*, 833 F. Supp. 2d 255, 261-62 (E.D.N.Y. 2011), *vacated and remanded on other grounds*, 706 F.3d 131 (2d Cir. 2013). Furthermore, the court shall instruct the jury and give limiting instruction that the jury must not reach a verdict out

of sympathy for any party, or based on a consideration of the potential consequences defendant faces if convicted.

Thus, the court **grants**, in part, the government's fifth motion *in limine*, with respect to the government's request to preclude evidence or argument concerning the potential punishment or consequences defendant faces if convicted.

## F. Motion to Admit Evidence Concerning Defendant's Financial Motive to Commit the Charged Offenses

The government's sixth motion *in limine* requests that the court admit evidence of Mr. Inniss's "financial motive" to commit the charged offenses, as direct evidence or, in the alternative, as evidence pursuant to Rule 404(b). (ECF No. 53, Supplemental Motion in Limine by USA as to Donville Inniss.) As set forth in the government's motion, Mr. Inniss is alleged to have received approximately $36,000 in bribe payments from ICBL through bank accounts in the United States. (*Id*. at 1-2.) Shortly before and during the same time period that Mr. Inniss was allegedly accepting and laundering bribe payments from ICBL, emails supposedly show that he was facing financial difficulties. (*Id*. at 2.) The government stated that, on March 5, 2015, defendant sent an email to an individual (the "Individual") requesting a $75,000 loan to assist with an investment and college fees for his son; in that email, he also

31

wrote that time was "of the essence." (*Id.*; ECF No. 46, Ex. A, GX 71.)

After receiving the loan, emails allegedly show that defendant had trouble repaying it. On August 18, 2015, defendant sent the Individual an email stating that he had just missed a call and he had "not forgotten loans." (ECF No. 46, Ex. A, GX 74.) Defendant explained there were "[d]elays on my end." (*Id.*) On the following day, defendant allegedly deposited a $16,000 check from the New York Dental Company into his personal bank account. (ECF No. 46, Ex. A, GX 13.) On October 26, 2015, the Individual emailed defendant, requesting overdue loan payments: "Donville, our year end is December as you know, we need to get the outstanding monthly payments of $2,000 per month from July to December for a total of $12,000 before then[.]" (ECF No. 46, Ex. A, GX 75.) In response, defendant stated: "I have expended 32k here to deal with issues arising from a [sic] our extortionist friend in jail! Will call you tomorrow[.]" (*Id.*) On November 23, 2015, defendant sent the Individual an email requesting an account number so he could "rob a bank and pay[.]" (ECF No. 46, Ex. A, GX 76.) On December 8, 2015, defendant emailed the Individual, stating, "My challenge is getting USD[.]" (ECF No. 46, Ex. A, GX 77.) On March 9, 2016, the Individual emailed defendant, asking, "Will

32

you have any outstanding repayment amounts for me next week??
Any currency is OK[.]"  (ECF No. 46, Ex. A, GX 79.)

On May 19, 2016, defendant emailed the Individual,
requesting the "name of payee and mailing address so that I may
mail a USD check to get loan payment going"; the Individual
responded with the requested information.  (ECF No. 46, Ex. A,
GX 81.)  On or about June 7, 2016, defendant appears to have
sent a check of $2,000 to the payee that the Individual had
identified.  (ECF No. 46, Ex. A, GX 83.)  Defendant allegedly
sent this check from the same account in which he deposited the
$16,000 check from the New York Dental Company in August 2015.
(ECF No. 53, Supplemental Motion in Limine by USA as to Donville
Inniss 2.)  On October 24, 2016, defendant emailed the
Individual stating that he had sent him a check in August "that
seems not to have cleared account"; the Individual responded
that he had received the check.  (ECF No. 46, Ex. A, GX 83.)

In its opposition, Mr. Inniss's counsel asserts that
the "probative value of . . . evidence of [Mr. Inniss's] debt is
substantially outweighed by the prejudice" to Mr. Inniss.  (ECF
No. 63, Response in Opposition re Supplemental Motion in Limine
2-3.)  In support of its opposition, defendant's counsel makes
the following assertions: (i) "the evidence of motive. . .
unfairly characterizes Donville Inniss as a person in
significant debt"; (ii) "there is no connection between receipt

33

of the bribes and repayment of the [$75,000] loan," which are allegedly temporally "too far removed" from each other; and (iii) the government's argument assumes a fact that never happened, *i.e.* that Mr. Inniss accepted a bribe of $20,000 in order to pay $20,000 in past due loan obligations.  (*Id.*)

As an initial matter, "[i]t is in the trial judge's discretion to admit evidence suggesting the defendant['s] motive for the crime charged." *United States v. King*, 560 F.2d 122, 133 (2d Cir. 1977) (citations omitted).  In a number of cases within the Second Circuit, courts have admitted evidence of financial difficulty on the grounds that it is relevant and not unduly prejudicial.  For example, in *United States v. Reed*, the Second Circuit found that, in a case charging defendant, operations manager at a brokerage house, with securities fraud and mail fraud, evidence that defendant was behind in his mortgage payments and was thus facing potential foreclosure was relevant "because a defendant's belief that he is in financial difficulty is admissible to show motive, and not unduly prejudicial." *United States v. Reed*, 639 F.2d 896, 907 (2d Cir. 1981).  The court also noted that "there is nothing inherently prejudicial about being behind in one's mortgage payments." *Id.* Moreover, such evidence was not hearsay because it went to defendant's belief, rather than the truth of the matter asserted.  *Id.*  Similarly, in *United States v. Polansky*, the

34

Second Circuit ruled that, in a case charging defendant with solicitation and receipt of a bribe, the court properly allowed the government to cross-examine defendant concerning his financial liabilities, which were in excess of $100,000, because defendant's outstanding debts "tended to show that [defendant] had a motive for seeking and accepting gratuities." *United States v. Polansky*, 418 F.2d 444, 448 (2d Cir. 1969).   Evidence of motive may also be admissible as circumstantial evidence. *United States v. Zive*, 299 F. Supp. 1273, 1277 (S.D.N.Y. 1969).

        The court finds that evidence of defendant's debt obligations – including defendant's seeking out and obtaining a $75,000 loan from the Individual, as well as documents and communications concerning the repayment of the loan – is relevant, probative of defendant's state of mind, including motive, and not unduly prejudicial.  *See generally United States v. King*, 560 F.2d 122, 133 (2d Cir. 1977) (citations omitted); *United States v. Reed*, 639 F.2d 896, 907 (2d Cir. 1981); *United States v. Polansky*, 418 F.2d 444, 448 (2d Cir. 1969); *United States v. Zive*, 299 F. Supp. 1273, 1277 (S.D.N.Y. 1969).  In addition, the court finds that defendant's interactions with the Individual concerning his debt obligations provide background and context for the charged offenses; thus, such evidence is admissible to show "circumstances surrounding the events" at

issue.  *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (citations omitted).

The court disagrees that evidence concerning Mr. Inniss's financial motive was temporally "too far removed" from his alleged receipt of the bribes.  As noted above, one month after defendant allegedly accepted a bribe payment in April 2016, defendant stated that he was going "to get loan payment going."  (ECF No. 53, Supplemental Motion in Limine by USA as to Donville Inniss 2-3.)  Defendant also allegedly deposited a $16,000 check from the New York Dental Company into his personal bank account, one day after he emailed the Individual noting that there were delays on his end in effectuating the loan payments.  (*Id.* at 2.)  Notably, Mr. Inniss is charged in the Indictment with having used "a United States bank account in the name of the New York Dental Company" to further the money laundering scheme.  (ECF No. 50, Indictment ¶¶ 11, 14, 15, 18, *et seq.*)  For the foregoing reasons, the court **grants** the government's motion to admit evidence concerning Mr. Inniss's $75,000 debt obligation, including supporting documentation and communications with the Individual.[3]

---

[3] The court notes defendant's objection to evidence of Mr. Inniss's past due loan obligations on the ground that such evidence "relies upon the inference the Donville Inniss accepted a bribe in the amount of approximately $20,000 to be used to repay $20,000 in past due loan obligations," which is "a false inference."  (ECF No. 63, Response in Opposition re Supplemental Motion in Limine 3.)  The government has charged Mr. Inniss, along with others, with substantive money laundering counts in violation of 18 U.S.C. § 1956(a)(2)(A); the offense conduct allegedly includes a "wire transfer in the

## G. **Motion to Produce and Find a Document Not Protected by the Attorney-Client Privilege**

The government's seventh motion *in limine* requests that the court find that the document at issue (the "Document") is not protected by the attorney-client privilege.[4] (ECF No. 54, Privilege Motion.) The court has examined the Document, the Supporting Documents submitted by the government, and the factual background provided by the government and by Ms. Innes, who has asserted attorney-client privilege with respect to the Document. The court does not now consider whether the Document is relevant, probative, or unduly prejudicial with respect to Mr. Inniss's upcoming trial. Rather, the sole aim of the government's Privilege Motion is to allow the court to rule on whether the Document is protected by the attorney-client privilege.

The government asserts that (1) the Document is not protected by the attorney-client privilege because it was allegedly not kept confidential and (2) even if the Document had been confidential, Ms. Innes waived the attorney-client

---

amount of approximately $20,000 from a Bermuda Company account in Bermuda to a bank account at Bank 1 in Elmont, New York, in the name of the New York Dental Company," on approximately April 18, 2016. (ECF No. 50, Indictment ¶ 24.) As the court noted in footnote two, for the purpose of ruling on the admissibility of evidence, the court accepts as true the government's factual characterizations regarding the evidence it seeks to admit, as contained in the government's motions *in limine*.

[4] The Document was provided to the court under seal by the government, in support of its Privilege Motion, along with six other documentary exhibits ("Supporting Documents").

privilege with respect to the Document when she voluntarily provided the tablet computer containing the Document to KPMG. (ECF No. 54, Privilege Motion 4-6.)  In opposition to the government's motion, Ms. Innes's counsel asserts that (1) the Document, which was allegedly prepared by Ms. Innes at the direction of, and for her counsel, for the purpose of securing legal advice, is an attorney-client privileged communication, and (2) Ms. Innes "did not waive the privilege when, complying with a directive received from her employer, she returned company-issued computer devices and inadvertently forgot to remove a copy of the attorney-client privileged communication." (ECF No. 73, Privilege Opp. 1.)  For the reasons set forth below, the court **respectfully denies** the government's motion and finds that the Document is protected by the attorney-client privilege and that Ms. Innes has not waived the attorney-client privilege with respect to the Document.

### 1. Relevant Facts[5]

According to the Document's metadata, the Document was created by Ms. Innes on October 9, 2016, approximately four days after she was suspended from her employment at ICBL for alleged conduct that was likely to result in litigation. (*Id.* at 2; ECF No. 54, Ex. C.)  The three-page Document, which is titled

---

[5] To the extent that certain facts are not in dispute, the court relies upon them for the purpose of ruling on the government's Privilege Motion.

"Chronological Order of Events," appears to be a memorandum
recounting ICBL's "business development" efforts generally,
including ICBL's attempts "in gaining and preserving Government
Business[.]"  (ECF No. 54, Ex. A.)  The Document mentions
interactions between Mr. Inniss and other individuals at IBCL,
including a reference to an alleged "verbal agreement [between
Mr. Tasker and Mr. Inniss, obligating ICBL] to pay an annual
retainer to promote, market and develop business[.]"  (*Id*.)  The
Document sets forth, from the perspective of Ms. Innes, a
bulleted chronology of the events leading up to and around the
time of Ms. Innes's suspension from ICBL.  The court understands
that Ms. Innes was suspended from ICBL on October 5, 2016, (ECF
No. 73, Privilege Opp. 2.); the Document describes events that
allegedly occurred on "Tuesday, afternoon, October 4th,"
"Oct[ober] 5," and "October 7."  (ECF No. 54, Ex. A.)

        According to Ms. Innes's counsel, Ms. Innes secured
legal counsel in Barbados, within a few days following her
suspension, to represent her in connection with ICBL's internal
investigation and in anticipation of potential litigation.  (ECF
No. 73, Privilege Opp. 1 and Ex. 2.)  Ms. Innes is not herself a
lawyer.  (ECF No. 54, Privilege Motion 2.)  Ms. Innes's then-
counsel, Mr. Tariq Khan ("Mr. Khan"), requested that Ms. Innes
prepare, for his use, a summary of the background facts and
events leading up to her suspension.  (*Id*. at 1-2.)

Consequently, Ms. Innes prepared the Document that is the subject of the present dispute. (Innes Decl. ¶ 5.) Ms. Innes prepared the Document, when she was away on vacation, on a company-issued tablet (the "Device"); she saved the Document to the Device's local hard drive, as opposed to "ICBL's computer system."[6] (ECF No. 73, Privilege Opp. 2; ECF No. 54, Privilege Motion 2-3.) The Document was not password-protected, and it does not contain any express notation that it is attorney-client privileged. (ECF No. 54, Privilege Motion 2-3.) On October 9, 2016, Ms. Innes sent the Document, using her personal, private Gmail account, to her counsel, Mr. Khan. (ECF No. 73, Privilege Opp. 2.)

On October 23, 2016, John Wight, the President and CEO of BF&M Limited, ICBL's parent company, informed Ms. Innes that "during the suspended period, the company issued laptop and phone [must] be returned to the company." (ECF No. 54, Ex. D at 5.) On October 25, 2016, Mr. Wight again wrote to Ms. Innes, requesting that she return her company-issued laptop and phone: "KPMG, who are advising the Board of Directors of ICBL, [are] to secure and image your Company issued laptop and mobile device. These will be returned to you following this process." (*Id.* at

---

[6] Though "ICBL's computer system" is rather vague, the court understands this to refer to a shared drive or network that was accessible to ICBL. In any event, the parties appear to agree that Ms. Innes *locally* saved the Document to the "Documents" folder on the Device's hard drive. (ECF No. 54, Privilege Motion 2; ECF No. 73, Privilege Opp. 2.)

2-3.)  In response, Ms. Innes informed Mr. Wight that she "would be happy to do this but I am flying to Barbados this morning and [am] actually at the gate for the 8:20am flight."  (*Id.* at 2.) Later that evening, Mr. Wight wrote to Ms. Innes for the third time regarding her company-issued laptop and phone: "We will require you to bring your laptop and company issued phone to the KPMG offices in Barbados tomorrow morning. Can you please contact [name omitted] of KPMG first thing tomorrow morning to drop those off."  (*Id.*)

On October 26, 2016, Ms. Innes wrote to Mr. Wight, "Laptops and cell delivered to kpmg.  Just realized that I have an IPad [*sic*] also.  Emails are not on the IPad [*sic*] – I will deliver to kpmg in the next couple of days[.]"  (ECF No. 54, Ex. E at 1.)  Later that day, Mr. Wight responded, "Please drop off [the iPad] at the KPMG offices tomorrow morning."  (*Id.*)  Ms. Innes complied with Mr. Wight's request that she return the iPad, *i.e.* the Device.  (ECF No. 54, Privilege Motion 2.)  The government notes that KPMG "found the Document while searching the [Device] for information relevant to ICBL's internal investigation" and that ICBL informed the government that Ms. Innes "did not delete the Document from the [Device] before turning it over to KPMG."  (*Id.*)  The government further notes that "ICBL's outside counsel voluntarily produced the Document to the government on or about December 9, 2016."  (*Id.* at 3.)

The parties are in apparent agreement that, during an interview of Ms. Innes conducted by KPMG in late December 2016 ("December 2016 Interview"), the Document was shown to Ms. Innes.  During the December 2016 Interview, Mr. Khan asserted attorney-client privilege over the Document, directed Ms. Innes not to answer questions about the Document, and terminated the interview.  (*Id.*; ECF No. 73, Privilege Opp. 3; ECF No. 73, Ex. 1 ¶ 14.)  According to Ms. Innes's counsel, Ms. Innes and Mr. Khan "did not discover that the attorney-client privileged document had been inadvertently disclosed until it was shown to them during [the December 2016 Interview]."  (ECF No. 73, Privilege Opp. 3.)  After the December 2016 Interview, Mr. Khan "formally objected to ICBL's use of the [Document] in connection with an employment hearing" on the basis of attorney-client privilege.  (*Id.*; ECF No. 73, Ex. 1 ¶ 14.)  At some point after the December 2016 Interview, Ms. Innes allegedly retained a lawyer in the United States who engaged in discussions with the government about the government's investigation.  (ECF No. 54, Privilege Motion 3.)  Ms. Innes's counsel represents that, by letter dated May 10, 2017, Ms. Innes's counsel continued to assert that the Document was protected by the attorney-client privilege, which had not been waived, and requested that the government destroy all copies of the Document.  (*Id.*; ECF No. 73, Privilege Opp. 3.)  To date, Ms. Innes' counsel has not

filed any motion in this court claiming privilege over the Document.  (ECF No. 54, Privilege Motion 3.)

Ms. Innes's counsel represents that, "[h]aving created the [Document] weeks earlier, and in complying with the company's demand that she immediately return her devices, Innes simply forgot that the attorney-client privileged document was saved on the local hard drive on one of her devices."  (ECF No. 73, Privilege Opp. 3.)  Furthermore, Ms. Innes's counsel represents that neither Ms. Innes nor Mr. Khan knew of the inadvertent disclosure until the Document was shown to them during the December 2016 Interview.  (*Id.*)

## 2. Legal Standards and Application

The Second Circuit has stated:

> [T]he attorney-client privilege, dating back to the 1600s, is the most ancient of the confidential communication privileges.  Originally, it was the attorney's privilege; today, it is recognized as the client's. . . . . The purposes for the privilege are twofold: first, it assures that a person seeking legal advice may do so safely.  Its existence therefore encourages the full and truthful revelation by the client of all the facts in his possession.  Second, no attorney can represent a client effectively unless the client discloses fully all the facts in his possession.  Thus, the privilege 'recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.'

*United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

i.  **The Document Is Protected by the Attorney-Client Privilege**

A party claiming attorney-client privilege must show "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007) (citation omitted).

As Ms. Innes' counsel notes, the government does not dispute that the Document was an attorney-client communication that was prepared by Ms. Innes at the direction of and for her counsel for the purpose of securing legal advice. (ECF No. 73, Privilege Opp. 4.) Based on the court's review of Ms. Innes's Declaration and an email from Ms. Innes to Mr. Khan, which were submitted to the court for *in camera* review, the court notes that Ms. Innes appears to have retained Mr. Khan as legal counsel following her suspension. (ECF No. 73, Ex. 1, Innes Decl. ¶¶ 3-6; ECF No. 73, Ex. 2, Email from Ms. Innes to Mr. Khan, dated Oct. 9, 2016.) Moreover, Ms. Innes appears to have prepared the Document at Mr. Khan's request, for the purpose of receiving legal advice. Therefore, in assessing whether the Document is protected by the attorney-client privilege, the

44

court's inquiry turns on whether or not Ms. Innes intended for
the Document to be and in fact kept it confidential. *In re
County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007) (citation
omitted).

As the government notes, the Second Circuit has not
"specifically addressed the extent to which information stored
on an employer's computer system can be a confidential
communication for purposes of the attorney-client privilege."
*Orbit One Commc'ns, Inc. v. Numerex Corp.*, 255 F.R.D. 98, 107-08
(S.D.N.Y. 2008). Thus, the court analyzes the four advisory
factors outlined in *United States v. Hatfield* to evaluate
whether Ms. Innes, as an employee, had a "reasonable
expectation" that the Document would remain confidential despite
being stored on her company's Device. *United States v.
Hatfield*, No. 06-CR-0550 (JS), 2009 WL 3806300, at *8 (E.D.N.Y.
Nov. 13, 2009). In assessing an employee's reasonable
expectation of privacy for material stored on employer-issued
electronic devices or on an employer's email account, courts
have increasingly considered the following: "'(1) does the
corporation maintain a policy banning personal or other
objectionable use, (2) does the company monitor the use of the
employee's computer or e-mail, (3) do third parties have a right
of access to the computer or e-mails, and (4) did the
corporation notify the employee, or was the employee aware, of

45

the use and monitoring policies?'" *United States v. Finazzo*, No. 10-CR-457 (RRM), 2013 WL 619572, at *7 (E.D.N.Y. Feb. 19, 2013) (quoting *In re Reserve Fund Sec. & Deriv. Litig.*, 275 F.R.D. 154, 160 (S.D.N.Y. 2011), *aff'd by United States v. Finazzo*, 682 F. App'x 6, 15-16 (2d Cir. 2017). To be sure, this test involves a "highly fact-dependent analysis." *Finazzo*, No. 10-CR-457 (RRM), 2013 WL 619572, at *7.

The government asserts that Ms. Innes did not have a "reasonable expectation" that the Document was confidential because (1) ICBL's Code of Conduct bans "outside daily activity" (Ex. F, Code of Conduct ¶ 1.11.3); (2) ICBL's Code of Conduct notes that "the Company reserves the right to monitor or review all data and information contained on an employee's Company-issued computer or electronic device" (*Id.* ¶ 1.11.4); (3) although ICBL does not "as a general matter grant[] third parties a regular right of access to Company-issued technologies," Ms. Innes nevertheless could have "reasonably foresee[n] that ICBL could have chosen to grant a third party such as KPMG access to the tablet"; and (4) Ms. Innes was aware of ICBL's Code of Conduct. (*See generally* ECF No. 54, Privilege Motion 4-5.)

In response, Ms. Innes's counsel asserts that Ms. Innes did have a reasonable expectation that the Document would be kept confidential because (1) ICBL's Code of Conduct did not

prohibit all types of personal use on company computers; (2) there is no evidence that ICBL actually monitored the company's computer system or the local hard drives of employees' devices; (3) the government has conceded that ICBL did not generally grant third parties the right to access ICBL's computers or emails; and (4) though Ms. Innes was "generally aware of the company's policy, she also knew that it did not provide that the company *will* monitor" employees' hard drives.  (ECF No. 73, Privilege Opp. 5-6.)

Applying the above four advisory factors, the court finds that, on balance, they slightly favor Ms. Innes's position.  <u>First</u>, the court finds that ICBL's policy does not ban all personal use of company-issued electronic devices. Though the Code of Conduct contains certain proscriptions against, *e.g.*, "fraud or theft," as well as use of company equipment "in the conduct of an outside business or in support of any religious, political or other outside daily activity," these proscriptions do not rise to the level of an outright or total ban on all personal use or personal legal use.  (ECF No. 54, Ex. F, Code of Conduct ¶¶ 1.11.1-1.11.4.)  In *Hatfield*, the court found that this factor favored the party asserting attorney-client privilege where the company's policy did not ban their employees from using company equipment to conduct personal legal matters.  *Hatfield*, No. 06-CR-0550, 2009 WL 3806300, at

47

*9. Furthermore, the fact that the employer's Code of Conduct states that "Company resources, such as . . . equipment . . . are provided for Company business use" does not necessarily negate an employee's reasonable expectation that documents on her computer will be kept confidential. (ECF No. 54, Ex. F, Code of Conduct ¶ 1.11.1.) Thus, this factor tips in favor of Ms. Innes.

Second, the court finds that ICBL has not established, official company policy notwithstanding, that it monitors the use of employees' computers or emails. Apart from an unsworn letter from ICBL's outside counsel, Mr. Adam B. Siegel, which claims that the company "avails itself" of its right to "monitor[] Company-issued computers and electronic devices, including tablets, when a breach of Company policy is suspected, when requested by senior management, and in other circumstances as appropriate," (ECF No. 54, Ex. G, Letter from Mr. Siegel to Mr. Moody, dated 6/9/2017) there is insufficient basis to believe that ICBL actually enforced its computer policies, not to mention enforced them on a regular basis. Indeed, Ms. Innes's sworn Declaration noted that, to her knowledge as former CEO, "the company did not generally enforce this [monitoring] policy, let alone monitor or access the local hard drives of employee's computers." (ECF No. 73, Ex. 1, Innes Decl. ¶ 18.)

In *Curto v. Medical World Communications, Inc.*, a New York federal court recognized that whether an employer routinely enforced its computer usage policies is relevant to the court's assessment of the employee's "reasonable expectation" of confidentiality when conducting personal business on an employer-issued device. *Curto v. Med. World Commc'ns, Inc.*, No. 03-CV-6327 (DRH), 2006 WL 1318387, at *3 (E.D.N.Y. May 15, 2006) (employer's general lack of enforcement of its computer usage policies created a "false sense of security" that lulled employees into believing that the policy would not be enforced). Courts have also found that a computer policy that indicates the company *reserves the right* to or *may* monitor information on employees' company-issued devices, *as is the case here*, is distinct from a computer policy that indicates the company *will* monitor such devices. *Id*. at *6 (distinguishing a policy stating that auditing "shall be implemented" from one stating that the employer "may" monitor the employee's computer usage); *United States v. Hatfield*, 2009 WL 3806300, at *9 (E.D.N.Y. Nov. 13, 2009) (noting that the policy does not indicate that company "*will* monitor employee computer hard drive or e-mail files, only that it has the *right* to do so").[7]

---

[7] Though the court finds that this advisory factor weighs in Ms. Innes's favor, the court also cautions against an undue focus on the specific wording of any company's computer policy, insofar as this factor assumes that a typical employee actually reads the entirety of his or her employer's computer policy and analyzes the specific language used therein.  To the

Furthermore, in *Orbit One*, a New York federal court found that the employee's expectation of confidentiality was reasonable, notwithstanding language in the employer's handbook, because the employer "never had ready access to [the employee's] computer" that contained the privileged documents. *Orbit One Commc'ns, Inc.*, 255 F.R.D. at 108. Here, it is undisputed that Ms. Innes created and stored the Document on her company-issued Device, while she was suspended from her employment and away on "vacation" abroad. (ECF No. 73, Ex. 1, Innes Decl. ¶¶ 2, 5-6.) It is also undisputed that Ms. Innes did not save the Document to ICBL's computer system or, as far as the court is aware, otherwise connect the Device to ICBL's computer system while on vacation. (*Id.* ¶¶ 6-7.) ICBL's counsel represented to the government that "ICBL could have remotely monitored and accessed [the Document] that the metadata shows was stored in the 'My

---

extent that an employer's computer policy or Code of Conduct arguably may be akin to a contract of adhesion, it may be inappropriate for courts to discount an employee's claim that he or she had a reasonable expectation of confidentiality in documents or files stored on an employer's device, simply because the Code of Conduct evinces the employer's intent to monitor its employees' computers. *See Klos v. Lotnicze*, 133 F.3d 164, 168-69 (2d Cir. 1997) (noting that a "contract of adhesion is a contract formed as a 'product of a gross inequality of bargaining power' between parties" typically "offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms," and noting that the concept of adhesion contracts "evolved from public policy that refuses to enforce a contract provision when it offends basic notions of civility and fair play"); Restatement (Second) of Contracts § 178 (1981) (discussing agreements that are unenforceable on grounds of public policy). *Cf. EEOC v. Morgan Stanley & Co.*, No. 01-CV-8421 (RMB)(RLE), 2002 WL 31108179 (S.D.N.Y. Sept. 20, 2002) (finding provision restricting speech in employer's Code of Conduct was unenforceable because it violated public policy).

Documents' folder on the tablet, for example, via an established
VPN connection." (ECF No. 54, Ex. G, Letter from Mr. Siegel to
Mr. Moody 1-2.) Crucially, ICBL's counsel and the government
have *not* indicated that Ms. Innes ever connected the Device to
the company's networks via a VPN connection when she created,
stored, or used her personal email to transmit the Document to
her counsel. Thus, the court finds that the government has not
established that ICBL, in fact, had "ready access" or the
technological capability to monitor or inspect the contents of
the Device's local hard drive while Ms. Innes was away on
vacation. Thus, this factor also tips in favor of Ms. Innes.

Third, because the government concedes that "ICBL does
not 'as a general matter grant[] third parties a regular right
of access to Company-issued technologies,'" this factor favors
Ms. Innes's position. The government claims that it was
"reasonably foreseeable that ICBL could have chosen to grant a
third party such as KPMG access to the tablet that contained the
Document in connection with its 'independent' investigation,"
which is what ultimately occurred in this case. (ECF No. 54,
Privilege Motion 5.) There is no evidence that KPMG or any
other third party was granted access to the Device containing
the Document at the time the Document was created, stored, and
transmitted to Ms. Innes's counsel. Indeed, the Document was
not discovered until KPMG was in physical possession of the

Device.  As Ms. Innes's counsel notes, "[W]hen Ms. Innes created the Document on October 9, 2016, no third-party had been granted access to ICBL's computers or systems."  (ECF No. 73, Privilege Opp. 6.)  And, as noted above, Ms. Innes created the Document when she was traveling abroad and not connected to the company's server.  Therefore, at the time Ms. Innes created the Document, the court finds that she had a reasonable expectation that third parties would not have access to the Document.

Fourth, the court finds that there is sufficient evidence that Ms. Innes was aware of ICBL's Code of Conduct and the use and monitoring policies, thus this factor weighs in favor of the government.  Nevertheless, for reasons discussed above, the court finds that Ms. Innes had a reasonable expectation that her communications with her attorney, including the Document at issue, would be kept confidential.  As ICBL's counsel represented to the government in its June 9, 2017 letter, Ms. Innes was provided with the company's Code of Conduct and signed a "Managing Director's Message" urging ICBL's employees to "promote the principles set out in this Code." (ECF No. 54, Ex. G, Letter from Mr. Siegel to Mr. Moody 2.)  The court notes that though "ICBL [was not] able to locate records regarding the last time Ms. Innes was formally notified of the Company's policies prior to October 9, 2016, or certified her understanding of such policies," *id.,* Ms. Innes has conceded

that she "was generally aware of the company's policy," (ECF No. 73, Privilege Opp. 6.).

The government also asserts that Ms. Innes "apparently requested that ICBL monitor the technology of other employees." (ECF No. 54, Privilege Motion 5; ECF No. 54, Ex. G, Letter from Mr. Siegel to Mr. Moody 2.)  If true, such a request may bolster an inference that Ms. Innes was aware that her own personal activities on company-issued devices could be subject to monitoring.  Ms. Innes has represented that she "do[es] not recall requesting IT administrators to monitor other employees' company-issued technology."  (ECF No. 73, Ex. 1, Innes Decl. ¶ 18.)  Ms. Innes's counsel further asserts that Ms. Innes "knew that [the company's policy] did not provide that the company *will* monitor employee's[sic] computer hard drives," citing the *Curto* decision.  (ECF No. 73, Privilege Opp. 6.)  In *Curto*, the court noted that the company had actually enforced its computer policy on "approximately four instances," including instances where an employee "allegedly downloaded pornographic materials" and another employee "allegedly play[ed] poker on the internet." *Curto*, 2006 WL 1318387, at *3.  There, the court concluded that the general lack of enforcement of the company's computer policy, despite a few isolated instances of monitoring, did not vitiate plaintiff's assertion of attorney-client privilege over emails sent through her personal email account.  *Id*.  Here, in

53

contrast to *Curto*, the court finds that Ms. Innes's creation of
the Document, at the request of her attorney, for the purpose of
receiving legal advice, could hardly be seen as rising to the
level of the flagrantly offensive and inappropriate activities
that led to computer monitoring in *Curto*.  Applying *Curto*, the
court notes that even if ICBL had monitored a few employees'
computer activities for blatantly offensive conduct, that would
not necessarily negate Ms. Innes's reasonable expectation that
*her* activities would not be subject to monitoring.  In light of
the fact that Ms. Innes had been suspended by ICBL on October 5,
2016, just four days before she created the Document, and her
concession that she was generally aware of the company's
computer policy, the court finds that this factor weighs in the
government's favor.

On balance, the court finds that the four advisory
factors slightly favor Ms. Innes's position; thus, the court
concludes that Ms. Innes had a reasonable expectation that the
Document was and would remain confidential when she created it
and emailed it to her counsel.

## ii.  No Waiver of Attorney-Client Privilege

The government also asserts that, "even if the
Document were confidential, the defendant. . . waived any
attorney-client privilege that she may have had over the
Document when she voluntarily provided the tablet computer

54

containing the Document to KPMG . . . and failed to assert any privilege or take any other precautions to protect any privacy interest in the Document."  (ECF No. 54, Privilege Motion 6.)  "Voluntary disclosure of privileged communications to a third party results in waiver of the attorney-client privilege[.]"  *Local 851 of Int'l Bhd. of Teamsters v. Kuehne & Nagel Air Freight, Inc.*, 36 F. Supp. 2d 127, 129-30 (E.D.N.Y. 1998) (citations omitted).  The court is not convinced, however, that the present circumstances amount to "voluntary disclosure" or intentional waiver of the attorney-client privilege by Ms. Innes, based on her return of the Device at her employer's urging.  In arguing that "voluntary disclosure of confidential material to a third party waives any applicable attorney-client privilege," the government cites *Schanfield v. Sojitz Corporation of America*, *United States v. Jacobs*, and *Aventa Learning, Inc. v. K12, Inc*.  (*Id.* at 5.)  All three cases are easily distinguishable from the instant case.

In *Schanfield*, plaintiff had asserted attorney-client privilege over a number of emails between plaintiff and three of plaintiff's family members, one of whom was a non-attorney.  In those emails, plaintiff had shared "the underlying facts of his lawsuit and his initial ideas about legal strategy, and then [sought] advice on the matter from his [family members]," including his sister who was not a lawyer.  *Schanfield v. Sojitz*

*Corp. of Am.*, 258 F.R.D. 211, 216 (S.D.N.Y. 2009).  The court
found that plaintiff had waived the attorney-client privilege
over those communications when he disclosed them to his sister.
*Id.*  Unlike in *Schanfield*, the government has not alleged that
Ms. Innes discussed or knowingly divulged the substance of the
Document or her attorney's advice to anyone other than her
attorney.  And, because Ms. Innes sent the Document to her
attorney using her personal, private Gmail account, there is no
reason to believe that Ms. Innes disclosed the Document through
use of her company's email account or company server.

        The government also cites *United States v. Jacobs*, in
which the client had disclosed "the gist of [his] attorney's
advice" to third parties.  *United States v. Jacobs*, 117 F.3d 82,
90 (2d Cir. 1997), *abrogated on other grounds by Loughrin v.*
*United States*, 573 U.S. 351 (2014).  Despite the fact that the
client had inaccurately conveyed the substance of his attorney's
advice, the Second Circuit found that the client had waived the
attorney-client privilege over his attorney's communications.
*Id*. at 90.  As noted above, Ms. Innes is not alleged to have
communicated, whether orally or in writing, her attorney's legal
advice; thus, *Jacobs* is also distinguishable from the instant
case.

        The government next cites *Aventa Learning*, a
Washington federal civil case expressly applying Washington

56

state law, which the court does not find instructive here.
*Aventa Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083, 1106
(W.D. Wash. 2011). In that case, the employee waited "nearly a
year and [a] half following his relinquishment of the [company]
computer" before asserting attorney-client privilege, whereas in
the instant case, Ms. Innes asserted attorney-client privilege
over the Document in "late December 2016," as soon as she
realized the accidental disclosure, and approximately two months
after she returned the Device to her employer, ICBL, in late
October 2016. (*Id.*; ECF No. 54, Privilege Motion 2-3.)
Additionally, it is unclear whether the plaintiff in *Aventa
Learning* intentionally waived the attorney-client privilege,
whereas in the instant case, Ms. Innes has asserted that she
"did not recall that saved on one of the devices was the
Chronological Order of Events document [she had] prepared for
[her] attorney." (ECF No. 73, Ex. 1 ¶ 13.) Based on the
foregoing facts, the court finds that Ms. Innes' disclosure of
the Document to her employer, ICBL, did not amount to a
"voluntary disclosure" resulting in intentional waiver of her
attorney-client privilege over that Document. *Local 851 of
Int'l Bhd. of Teamsters v. Kuehne & Nagel Air Freight, Inc.*, 36
F. Supp. 2d 127, 129-30 (E.D.N.Y. 1998) (citations omitted).

Having found that Ms. Innes did not intentionally
waive the attorney-client privilege with respect to the

Document, the court now considers whether her inadvertent disclosure of the Document nevertheless resulted in waiver of the attorney-client privilege in regard to the Document.  Where "the disclosure was inadvertent, the attorney-client privilege will not be waived unless the producing party's conduct was 'so careless as to suggest that it was not concerned with the protection of the asserted privilege.'"  *Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, No. 96-CV-7590(DAB)(JCF), 1997 WL 736726, at *4 (S.D.N.Y. Nov. 26, 1997).

The standard test for waiver through inadvertent disclosure was discussed in *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Company*, 104 F.R.D. 103, 105 (S.D.N.Y. 1985). Under that test, a court must consider: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery and the extent of the disclosure; and (4) overarching issues of fairness.  *See id.*; *see also Prescient Partners, L.P.*, 1997 WL 736726, at *5-7.  Most courts in the Second Circuit have adopted a "flexible, 'middle of the road approach'" to inadvertent waiver, which provides that "inadvertent waiver will not waive the privilege unless the conduct of the producing party or its counsel evinced such extreme carelessness as to suggest that it was not concerned with the protection of the asserted privilege." *United States v. Gangi*, 1 F. Supp. 2d 256,

58

264 (S.D.N.Y. 1998); *see also In re Grand Jury Proceedings*, 219
F.3d 175, 183 (2d Cir. 2000) ("[W]hen waiver occurs as a result
of inadvertent document disclosure, courts have limited the
scope of that waiver based on the circumstances involved and
overall fairness.") (citing *Gangi*, 1 F. Supp. 2d 256, 264
(S.D.N.Y. 1998)).

        With respect to the first factor, courts have found
that a "disclosing party's failure to include a legend or other
notation identifying the document as an attorney-client
communication . . . weighs toward a finding of waiver." *LaSalle
Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending*, No. 04-CV-5452
(PKL), 2007 WL 2324292, at *4 (S.D.N.Y. Aug. 13, 2007)
(citations omitted); *Atronic Int'l, GmBH v. SAI Semispecialists
of Am., Inc.*, 232 F.R.D. 160, 164 (E.D.N.Y. 2005) (failure to
label documents "confidential" or "privileged" contributed
toward a finding of waiver); *Estiverne v. Goodwine*, No. 06-CV-
6617 (NG), 2009 WL 10706260, at *3 (E.D.N.Y. Oct. 19, 2009)
(failure to identify a procedure to keep privileged documents
separate from non-confidential documents weighs toward finding
of waiver); *Local 851 of Int'l Bhd. of Teamsters*, 36 F. Supp. 2d
at 132 (E.D.N.Y. 1998) (same).  A disclosing party's attempt to
delete the privileged communications from her work-issued
devices has been found to be a reasonable precaution to prevent
inadvertent disclosure.  *Curto v. Med. World. Commc'ns, Inc.*,

No. 03-CV-6327 (DRH)(MLO), 2006 WL 1318387, at *3 (E.D.N.Y. May 15, 2006).  The fact that Ms. Innes did not label her Document as "confidential" or "privileged," and did not delete the Document stored on the Device, are among the strongest arguments for a finding of waiver.  Other relevant facts point the other way.  As Ms. Innes's counsel notes, Ms. Innes took reasonable precautions to keep the Document confidential: she prepared the Document while out of office, saved the Document to the Device's local hard drive, to which ICBL did not have access, and emailed the Document using her private Gmail account, to which ICBL likewise did not have access.

        The government asserts that the fact that Ms. Innes sent the Document using her personal email account is "not before the Court" because the Document recovered from her tablet is "not an e-mail that the defendant sent through her personal e-mail account[.]"  (ECF No. 75, Privilege Reply 4.)  Though acknowledging the merits of the government's position, the court finds that Ms. Innes's sending of the Document through her personal email account indicates that she intended to keep, and took a reasonable precaution to keep, the Document confidential.  To be sure, the *Curto* decision explicitly found that an employee's sending of privileged communications, using a personal email account, which did not go through the employer's servers, was a reasonable precaution.  *Curto*, No. 03-CV-6327

(DRH)(MLO), 2006 WL 1318387, at *3 (E.D.N.Y. May 15, 2006).
Though Ms. Innes took certain reasonable precautions, she failed
to take an obvious and critical precaution when she allegedly
"forgot" to remove the privileged Document before returning the
Device to KPMG.  Thus, the first factor weighs in the
government's favor.

        With respect to the second factor, "[i]nordinate delay
in claiming the privilege can prejudice the adversary and may be
deemed waiver." *Local 851 of Int'l Bhd. of Teamsters*, 36 F.
Supp. 2d at 133 (E.D.N.Y. 1998) (citation omitted).  In one
case, the New York federal court found that defendant had
satisfied the second *Lois Sportswear* factor where he requested
the document's return one day after being made aware of its
inadvertent disclosure.  *Id*. (citing *Gangi*, 1 F. Supp. 2d at 266
(finding second factor satisfied where government sought relief
from the court the following day upon learning that privileged
information was disclosed).  Here, as noted above, when Ms.
Innes allegedly learned of the inadvertent disclosure of the
Document during the December 2016 Interview, Mr. Khan asserted
attorney-client privilege over the Document, and Ms. Innes was
allegedly instructed to not answer any questions regarding the
Document.  (ECF No. 73, Privilege Opp. 8; ECF No. 73, Ex. 1,
Innes Decl. ¶ 14.)  Applying the second factor of the *Lois
Sportswear* test, the court finds that Ms. Innes, through her

61

counsel, promptly took steps to rectify the error, so this
factor weighs in Ms. Innes's favor.

      With respect to the third *Lois Sportswear* factor,
courts look to whether the overall volume of documents produced
was substantial compared to the inadvertent disclosure.
"Extraordinary" circumstances, such as "expedited discovery or
massive document production . . . would lessen the significance
of the inadvertent disclosure." *Estiverne*, 2009 WL 10706260, at
*5.  If the disclosing party produced "a number of additional
documents" concerning the supposedly privileged subject matter,
the court may find that the inadvertent disclosure was not "an
isolated inadvertent error" and instead, fault the protective
measures or steps taken by the disclosing party to prevent such
disclosure.  *Id*.  Here, as discussed above, the record before
the court establishes that, on at least four separate occasions,
Ms. Innes's employer urgently requested that she return her
company-issued devices; specifically, between October 23, 2016
and October 26, 2016, Ms. Innes's employer emailed her four
times requesting that she drop off her company-issued devices
with the company.  (ECF No. 54, Exs. D and E.)  Ms. Innes
informed her employer that she was out of the country and would
return the devices as soon as she returned.  (ECF No. 54, Ex.
D.)  Ms. Innes delivered the company-issued laptop and cell
phone to KPMG, the day after her return to Barbados, on October

26, 2016.  (ECF No. 54, Ex. E.)  Soon after delivering the
laptop and cell phone, Ms. Innes informed her employer that she
"just realized" that she also had a company-issued tablet (*i.e.*
the Device), and the employer pressed her to return the Device
as well.  (ECF No. 54, Ex. E.)  As far as the court is aware,
the confidential attorney-client privileged Document was the
only such document stored on Ms. Innes's company-issued devices.

   The court is not aware of other facts that would
further shed light on how the third *Lois Sportswear* factor
should apply here, since neither the government nor Ms. Innes's
counsel have informed the court of the total number of documents
and data retrieved from Ms. Innes's company-issued devices.[8]  The
court observes that this is not a case in which an outside law
firm handles the collection, review, and production of a large
quantity of custodians' computer files, resulting in a small
number of privileged documents slipping through the cracks and
into the hands of the opposing party.  In the instant case, Ms.
Innes created the Document, which was intended to be kept
confidential, and two weeks later, as soon as she was physically
able to comply with her employer's directive, she personally,
yet inadvertently and mistakenly, delivered the Device

---

[8] Ms. Innes's counsel asserts that Ms. Innes's device likely contained
"hundreds if not thousands of separate documents, only one of which was a
three-page attorney-client privileged communication."  (ECF No. 73, Privilege
Opp. 8.)

containing the Document to a third party. Although the extent of the disclosure was small, Ms. Innes's lapse was quite significant and difficult to excuse. Accordingly, the court finds that this factor weighs in favor of the government.

With respect to the fourth *Lois Sportswear* factor, the court must consider whether unfairness would result to either party from the court's ruling. For example, if the government has "already relied on the contents" of the privileged document in shaping its litigation strategy, or if information contained in the privileged document "is vital to the factual claims" in the case, that consideration would weigh in the government's favor. *LaSalle Bank*, 2007 WL 2324292, at *6; *Atronic*, 232 F.R.D. at 166. Courts in the Second Circuit are generally reluctant to find inadvertent waiver and are willing to limit the scope of any waiver, where "the disclosure occurred early in the proceedings, was made to opposing counsel rather than to the court, and was not demonstrably prejudicial to [the] other party." *In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d Cir. 2000); *Gangi*, 1. F. Supp. 2d at 264 (S.D.N.Y. 1998). The court is also mindful that "clients should be encouraged to provide full disclosure to their attorneys without fear that their disclosure will be invaded[.]" *See Curto*, No. 03-CV-6327 (DRH)(MLO), 2006 WL 1318387, at *3; *see also In re Grand Jury Investigation*, 399 F.3d 527, 531-32 (2d Cir. 2005).

Here, Ms. Innes's counsel asserts that "[w]aivers of the attorney-client privilege should not be found based on a simple mistake, especially in a criminal case where a defendant's liberty is at stake and the privileged document is her description of events prepared for her attorney at her attorney's specific request." (ECF No. 73, Privilege Opp. 3.) The court agrees. Because the government has not established that it will be prejudiced if the Document is found to be protected by the attorney-client privilege, and because prejudice to Ms. Innes's defense will result should the court find waiver, the court finds that the fourth *Lois Sportswear* factor weighs strongly in favor of Ms. Innes.

Having applied the four factors outlined above, the court concludes that Ms. Innes and her counsel did not evince such "extreme carelessness" as to suggest that they were not concerned with the protection of the attorney-client privilege with respect to the Document at issue. *United States v. Gangi*, 1 F. Supp. 2d 256, 264 (S.D.N.Y. 1998); *see also In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d Cir. 2000). The court finds that the Document was and remains protected by the attorney-client privilege; further, the court finds that Ms. Innes's inadvertent disclosure of the Document has not waived the attorney-client privilege. For the reasons discussed above,

the court respectfully **denies** the government's seventh motion *in limine*.

### H. Motion to Admit Evidence Regarding Two 7,000 Barbadian Dollar "Donations"

The government's eighth motion *in limine*, which was styled as a "supplemental" motion *in limine*, requests that the court <u>admit</u> evidence concerning two 7,000 Barbadian dollar "donations," on January 14, 2015 and February 11, 2015, which ICBL allegedly made to Mr. Inniss, as direct evidence of the crimes charged or under Rule 404(b). (ECF No. 56, Supplement to Government's First Motion in Limine.) The government proffers "the same reasons described in [its] original motion" *in limine*, which concerned Mr. Inniss's request for a purported 4,000 Barbadian dollar "donation" in December 2015, as grounds for the court to admit evidence of these two 7,000 Barbadian dollar "donations" that ICBL also allegedly made to the Corporation on January 14, 2015 and February 11, 2015. (*Id*. at 2.)

In its opposition, defense counsel explained that it had not objected to the government's first motion *in limine* regarding the 4,000 Barbadian dollar "donation" because "it would seem that evidence [that Mr. Inniss] requested a bribe, on any date, *during the time period set forth in the indictment*, would be probative of the existence of the conduct alleged in the indictment. . . ." (ECF No. 64, Response in Opposition re

66

First Motion in Limine (Supplemental Letter Dated September 3,
2019) 1 (emphasis added).)  By contrast, defense counsel argues
that the government's request to admit the two additional
payments in the amount of 7,000 Barbadian dollars each, "fall
well outside of the August 2015 to April 2016 time period of the
money laundering conspiracy which is charged in Count One of the
superseding indictment."  (*Id.*)  Thus, defense counsel asserts
that this evidence "is not properly admissible as direct
evidence, because it has no evidentiary nexus or relationship to
the actual conspiracy charged, and can only serve to confuse or
mislead the jury."  (*Id.*)  Furthermore, defense counsel argues
that the court should also decline to admit such evidence under
Rule 404(b) because "this evidence is more properly reserved for
rebuttal evidence, depending upon the issues of law and/or
factual assertions to be raised by Donville Inniss at trial."
(*Id.*)

        In its reply, the government cites *United States v.
Reed* in arguing that the two purported "donations" should be
admitted as direct evidence.  (ECF No. 71, Letter Reply in
Support of Supplemental Motion in Limine.)  In *Reed*, the
district court had ruled that evidence of defendant's criminal
conduct from approximately two years prior to the date of the
charged criminal conspiracy, was admissible as direct evidence
because "it is intertwined with the evidence regarding the

charged offense" and comprised "background" evidence of defendant's relationship with a co-conspirator. *United States v. Reed*, no. 13-cr-1818, 2013 WL 6906827, at *15 (Appellant Br.) (2d Cir. Dec. 26, 2013). The Second Circuit affirmed, stating that evidence "relating to the time period before the charged conspiracy [is] admissible [when] it 'arose out of the same transaction or series of transactions as the charged offense, . . . is inextricably intertwined with the evidence regarding the charged offense, or . . . is necessary to complete the story of the crime on trial." *United States v. Reed*, 576 F. App'x 60, 61 (2d Cir. 2014) (quoting *Carboni*, 204 F.3d at 44).)

Here, the court finds that the two purported "donations," dated January 14, 2015 and February 11, 2015, "arose out of the same series of transactions as the charged offense," were allegedly "made . . . at around the time that co-defendant Ingrid Innes was seeking assistance from [Mr. Inniss] in connection with government affairs in Barbados," and were made to the Corporation, which defendant allegedly controlled, and which also received the 4,000 Barbadian dollar "donation" in December 2015. (ECF No. 71, Letter Reply in Support of Supplemental Motion in Limine 1-2.) Accordingly, the court finds that evidence regarding the two purported "donations" allegedly made to the Corporation from ICBL, in January and February 2015, is intertwined with evidence of, and comprises

direct evidence of, the charged conspiracy, and thus is admissible as direct evidence of the money laundering conspiracy charged in Count One of the Indictment.

Even if the two purported "donations" "were not inextricably intertwined, the district court [has] the discretion to admit them as background to the conspiracy, helping the jury understand how the illegal relationship among the participants developed, and how [defendant's] role in the conspiracy evolved[.]" *See United States v. Escalera*, 536 F. App'x 27, 32 (2d Cir. 2013); *see also United States v. Edwards*, 723 F. App'x 48, 50 (2d Cir. 2018) (evidence of uncharged conduct admissible to show defendant's "relationship with some of his co-conspirators" and was "necessary to complete the story of the crime on trial").

For the foregoing reasons, the court **grants** the government's eighth motion *in limine* to admit evidence of two purported "donations" from ICBL to the Corporation in January and February 2015.

<div align="center">

**CONCLUSION**
</div>

As set forth above, the court **grants**: (i) the government's first motion *in limine* to admit evidence regarding Mr. Inniss's solicitation of an alleged bribe from ICBL in December 2015, ICBL's payment of the alleged bribe, and the subsequent transfer of $6,500 from an account at First Caribbean

<div align="center">69</div>

International Bank (Barbados) Limited to Mr. Inniss's personal
bank account in Florida; (ii) the government's second motion *in
limine* to preclude defendant from introducing evidence
concerning either the activities, or inaction, of Barbadian law
enforcement against Mr. Inniss; (iii) the government's third
motion *in limine* to preclude any evidence that ICBL has paid
bribes to other individuals, or argument that bribery may have
been commonplace or part of industry practice in Barbados; (iv)
the government's fourth motion *in limine* to preclude evidence or
argument concerning Mr. Inniss's prior commission of "good acts"
or non-commission of other bad acts; (v) the government's sixth
motion *in limine* to admit evidence concerning Mr. Inniss's
$75,000 debt obligation, including supporting documentation and
communications with the Individual; and (vi) the government's
eighth motion *in limine* to admit evidence regarding two
purported "donations" made to the Corporation by ICBL in January
and February 2015.

The court **denies** the government's seventh motion *in
limine* and finds that the Document is protected by the attorney-
client privilege and that Ms. Innes has not waived the attorney-
client privilege with respect to the Document.  Thus, the
government should take reasonable steps to promptly remove
and/or destroy the Document and any copies thereof currently in

its possession and is not permitted to use the Document in its

prosecution of this case.

As noted above, the court **grants in part** and **denies in

part** the government's fifth motion *in limine*.

Lastly, as noted in footnote one, the court directs

Ms. Innes to file her unredacted declaration on ECF **by 5:00 p.m

on December 23, 2019.**  (ECF No. 73, Ex. 1.)

**SO ORDERED.**

Dated: December 20, 2019
       Brooklyn, New York

                                    _____/s/_____
                                    KIYO A. MATSUMOTO
                                    United States District Judge
                                    Eastern District of New York

71